UNITED STATES, Appellee,

v.

Specialist Four (E–4) Bryon C. PARKER, SSN 546–06–3197, United States Army, Appellant.

SPCM 13702.

U. S. Army Court of Military Review.

25 Oct. 1979.

Captain Paul T. Allen, Jr, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr, JAGC, Lieutenant Colonel John F. Lymburner, JAGC, Major Benjamin A. Sims, JAGC, and Major Grifton E. Carden, JAGC.

Captain James W. Hewitt, Jr, JAGC, argued the cause for the appellee. With him on the brief were Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, and Major Robert B. Williams, JAGC.

Before FULTON, DRIBBEN and WATKINS, Appellate Military Judges.

## OPINION OF THE COURT

FULTON, Senior Judge:

Specialist Four Parker appeals from his conviction by a court-martial for possessing marihuana at an American military base in Germany.[1] Attacking the conviction on several grounds related to the admissibility of the marihuana into evidence, he contends that (a) the gateway search in which the evidence was seized was unlawful, (b) the chain of custody over the evidence was insufficiently established, and (c) the laboratory report identifying the substance as marihuana was improperly admitted in evidence. Contention (b) raises the further issue of whether this Court may and should limit the retroactivity of a decision of a higher court, namely, the decision of the Court of Military Appeals in *United States v. Porter,* 7 M.J. 32 (C.M.A.1979), which held documentary evidence establishing a chain of custody to be inadmissible hearsay.

### Inspection at the Gate

The events leading to appellant's conviction began on Friday, 7 July 1978. At about 1700 hours, the officer exercising authority over the United States military installation of Peden Barracks, Federal Republic of Germany, authorized the military police to "search . . . all pedestrian and vehicular traffic entering and exiting [the main gate at] Peden Barracks between the hours of 2200–0200, on 7–8 JULY 1978."

1. A special court-martial military judge convicted him of wrongfully possessing 366 grams of marihuana in the hashish form at Peden Barracks, Federal Republic of Germany, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1976). Appellant's sentence as approved by the convening authority includes reduction to the grade of Private E–1, forfeiture of $200.00 pay per month for 6 months, confinement at hard labor for 75 days, and a bad-conduct discharge from the service.

The authorization stated that the searches were "to be conducted by SSG E–6 Joseph J. O'Hanlon . . . and other police personnel designated by him." They were authorized "to seize any items found in the possession of any individual subject to this search which possession thereof violates the Uniform Code of Military Justice, any standing lawful order or regulation." While the document did not specify the procedures to be used, Staff Sergeant O'Hanlon's testimony described the process as follows:

> I told them [the military policemen on duty] [that at] approximately 2200 hours we would start to conduct a gate search and the first thing to do was put an amnesty box outside the gate. . . . All foot traffic and vehicle traffic would be stopped and informed that we were conducting an authorized gate search and they would be asked for consent search of every person. Anybody who refused to consent was refused entrance on post.
> . . .
>
> \* \* \* \* \* \*
>
> Once they were advised of the search and gave their consent, they are to leave the vehicle and they [the military police team] would search the vehicle from the right side first, both military policemen, and then work to the left side. People in the automobile or foot traffic were advised to empty their pockets, place their hands in the wall search position . . .[2]

At about 2300 hours, the appellant arrived at the main gate by which Peden Barracks is entered from the German community of Wertheim. He was one of three military passengers in an automobile owned and operated by a fourth serviceman. They had been visiting Wertheim and had decided to get something to eat at Peden Barracks before returning to their own kaserne or quarters in Schweinfurt, Germany. In the vehicle was a bag belonging to the appellant. Variously described as a backpack or knapsack, it was yellow and bore appellant's initials ("BP"). It lay on the package ledge inside the rear window of the sedan. Inspection of the knapsack's contents by the military police disclosed four foil-wrapped packages which contained the marihuana involved in this appeal.

The military policeman who discovered the marihuana, Specialist Four Thompson, testified that, on his request, the driver affirmatively consented to a search of the automobile, and that each of the occupants consented to a search of his person. The occupants who testified said that they were merely told that they and the car would be searched, not asked for consent, and that they gave no consent (although it appears that they made no objection or protest). The military judge ruled that, "I do not find that the accused or any other occupant of the car consented to the search. However, under the authority of [*United States v.*] *Rivera* [4 M.J. 215 (C.M.A.1978)] and [*United States v.*] *Harris* [5 M.J. 44 (C.M.A. 1978)], . . . the motion to suppress the real evidence [*i. e.*, the knapsack and its contents, based upon an unlawful search] is denied."[3]

Judge Brown ruled correctly. Relying on an analogy to the line of Supreme Court decisions concerning border searches, *Rivera* holds that warrantless searches occurring at entry points onto American military installations from foreign soil are not unreasonable, even though made without probable cause, so long as the manner and degree of intrusion are not themselves un-

---

2. The purpose of the "amnesty box" (not material to this appeal) was described by Staff Sergeant O'Hanlon as follows: "Anybody that wants to put any contraband items in there, whether we see it or not, can put them in there while we stop them. If they come on post and they say, 'I want to go back to the amnesty box,' they are allowed to do so and they cannot be prosecuted."

3. Evidence received later revealed that appellant had told his unit commander, who came to the military police station at Peden Barracks, that they had consented to the search. For

reasonable.[4] *Rivera* does not require consent, and, except for Sergeant O'Hanlon's instructions to his military policemen, we find no requirement in this case that consent be sought or given.[5] In that light, we do not consider that any failure to have followed the sergeant's instructions rendered the evidence inadmissible.[6]

We can find nothing unreasonable about the manner or degree of intrusion in this case. Accordingly, we hold that the marihuana was not unlawfully seized.

### Proving the Chain of Custody

■ The appellant next contends that the evidence of his guilt is insufficient because the Government failed to establish a continuous chain of custody preserving the evidence in an unaltered state from the time it was seized until chemical analysis at a crime laboratory identified the substance as marihuana.[7] Because we agree that a continuous chain of custody was not established through the testimony of witnesses, we must consider the effect of *United States v. Porter,* 7 M.J. 32 (C.M.A.1979), on the admission in this trial of a Department of the Army Form 4137, entitled "Evidence/Property Custody Document."

Specialist Four Thompson, discoverer of the knapsack containing marihuana, testified that he removed it to the military police station, which was adjacent to the gateside parking lot where the search occurred, and that he subsequently turned it over to an unnamed criminal investigation agent whom he described as "a tall guy, I think, I can't exactly remember what he looks like, he was here that first time." [8] Shown Prosecution Exhibit Number 7, the yellow knapsack bearing the initials "BP," Thompson testified, "That's the same bag 'cause I had to open it up." The contents—originally four aluminum foil-wrapped packages, one of which was open sufficiently to reveal a brown, powdery substance—were shown to him as Prosecution Exhibit Number 8, described in the record as one plastic bag containing hashish and tin foil. He testified only that the contents were similar in substance and quantity to that seized.

Special Agent Werfel was not called to testify concerning his receipt, handling, and disposition of Prosecution Exhibits Number 7 and 8. It appears that he released them to Special Agent Dannie A. Taylor, who testified that he was the district evidence

---

reasons he did not explain, the judge ruled the statement inadmissible.

4. *United States v. Rivera,* 4 M.J. 215, 216–18 (C.M.A.1978) (opinion by Fletcher, C. J.); *United States v. Holsworth,* 7 M.J. 184, 186 (C.M.A. 1979). The record discloses no reason why the authorization was made for this particular time and date.

It also has been suggested that these procedures are justifiable as a form of inspection rather than a search. Lee, *Gateway Inspections: The Admissibility of Evidence Seized,* 19 Air Force L.Rev. 199, 199–202 (1977); *but see,* as to installations in the United States, *United States v. Harris,* 5 M.J. 44 (C.M.A.1978). See Eisenberg and Levine, *The Gate Search: Breaches in the Castle's Fortifications?,* The Army Lawyer, September 1979, at 5.

5. *Cf.* Army regulation 190–22, Military Police: Search, Seizure, and Disposition of Property, par. 2–3*b* (1970), discussing action to be taken when a prospective entrant objects to being searched. There is no evidence that the commander's authorization or any local standing instructions required that consent be obtained in this case.

6. *See United States v. Holsworth,* 7 M.J. 184 (C.M.A.1979). *United States v. Rotramel,* 1 M.J. 559 (A.F.C.M.R.1975), relied on by appellant, is a case in which the instructions not followed pertained to the authority to conduct inspections in the first place, rather than only to procedures used.

7. The admissibility of the crime laboratory report identifying the substance taken from appellant as marihuana is contested in this appeal on grounds recently resolved against the appellant in *United States v. Strangstalien,* 7 M.J. 225 (C.M.A.1979). In view of that decision, we will not discuss the issue. However, the question of the relevance of the report that the substance analyzed was marihuana is subsumed in our discussion of proof of the chain of custody, *infra.*

8. The allusion to "that first time" refers to an earlier trial session at which both Thompson and Special Agent David A. Werfel, the criminal investigator described, had appeared as witnesses.

custodian and that he received the knapsack with "hashish inside it," but did not say from whom he had received it and did not describe the condition of the contents. He testified only that he mailed it to the crime laboratory and received it back with the laboratory report mentioned in note 7, *supra,* identifying the vegetable matter contents as marihuana in the hashish form.

The "Evidence/Property Custody Document" (DA Form 4137, 1 Jul 1976) previously mentioned, sometimes also referred to as a chain of custody receipt, recites that one "Knap sack containing 4 chunks of marihuana in the hashish form" was obtained from the "Rear deck of 1966 Mercedes-Benz, Lic # NL–1072" as "Evidence" at "2310, 7 Jul 78." The source of the evidence was listed merely as "Crime scene," rather than any named person. The series of dates and signatures shows that Thompson confiscated the evidence on 7 July and released it on 8 July to Agent Werfel, who released it to Agent Taylor on 10 July, who sent it to the crime laboratory on the same day.

We have previously mentioned that Agent Werfel did not testify concerning his custody of the marihuana from 8 July to 10 July. "This lack of accounting is not consistent with the stringent tracing required as the foundation for admission of real evidence in the military trial." *United States v. Nault,* 4 M.J. 318, 320 (C.M.A.1978). Therefore, the marihuana was inadmissible

as real evidence unless the "Evidence/Property Custody Document" was properly received in evidence (it having been authenticated and introduced as Prosecution Exhibit Number 5). If the form was properly received, we may presume in the absence of anything to the contrary that each military policeman or criminal investigation agent who handled the evidence from its seizure until it was analyzed at the laboratory complied with the obligation specifically imposed by Army Regulation 195–5, Criminal Investigations: Evidence Procedures (1976), to preserve the integrity of the evidence. *United States v. Jenkins,* 5 M.J. 905, 907 (A.C.M.R.1978).

However, in *United States v. Porter,* 7 M.J. 32 (C.M.A.1979), decided after the trial in this case, the Court of Military Appeals considered the admissibility of the same kind of form and held as follows:

> The chain of custody forms offered by the prosecution as evidence constituted hearsay, incompetent and inadmissible under paragraph 139*a* of the Manual for Courts-Martial, United States, 1969 (Revised edition). Moreover, as these forms were obviously prepared 'principally with a view to prosecution,' they were not admissible under paragraph 144*d* of the Manual. *United States v. Nault, supra.*

7 M.J. at 33.[9] If *Porter* applies to appellant's trial, the failure to prove the chain of custody made inadmissible the evidence that the substance in appellant's knapsack

---

**9.** *Accord, United States v. Neutze,* 7 M.J. 30 (C.M.A.1979), holding that, because the chain of custody form is hearsay, it did not, under present military rules of evidence, become competent by failure to object to its admission. (Authentication may be waived, however. *United States v. Strangstalien,* 7 M.J. 225, 228 (C.M.A.1979).)

In *United States v. Nault,* 4 M.J. 318 (C.M.A. 1978), cited in the quotation above, Chief Judge Fletcher had observed in dictum that "[t]he proposition that a report showing the chain of custody of an alleged drug qualifies for the business records exception in a prosecution for possession of [the drug] . . . simply flies in the face of paragraph 144*d* of the Manual . . . ." *Id.* at 320 n. 7. Although the language of *Neutze* and *Porter* is somewhat broader, we do not read either decision to say that the chain of custody form could not qualify as a

business entry, but merely that it remains inadmissible under the Manual because of having been prepared principally with a view to prosecution. *Cf. United States v. Strangstalien, supra.*

Under new military rules of evidence being proposed for promulgation as an Executive Order, hearsay would no longer be incompetent evidence, and would be inadmissible only on objection. Also, chain of custody receipts could be recognized as a type of public record and the evidentiary limitation on records made with a view to prosecution would be eliminated. Lederer, Survey of the Military Rules of Evidence 6 (unpublished lecture outline); see Letter, General Counsel, Department of Defense, to General Counsel, Office of Management and Budget, 12 Sep 1979, enclosing proposed rules (esp. rules 801–806).

was marihuana and his conviction must be reversed.

*Limiting Retroactivity: A Threshold Test*

■ The Government contends that *Porter* should not be applied retrospectively to appellant's prior trial even though his case is still undergoing direct review. To determine this issue, we must first decide whether *Porter* establishes a new rule, for, if it does not, there can be no question that the rule applies to this case. "[T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . ." [10]

The rule that evidence otherwise qualifying for admission under exceptions to the hearsay rule for business entries or official records will be nevertheless inadmissible if prepared principally with a view to prosecution is not new to military law. It first appeared in paragraph 130*d*, Manual for Courts-Martial, U.S. Army, 1949. Nor, in *Porter*, did the Court of Military Appeals overrule any of its own decisions. Even so, we regard *Porter* as a sufficiently clear break with the past to trigger a question of retroactivity. The only reported military decision squarely facing the issue held that chain of custody forms were not necessarily prepared for the purpose of prosecution.[11] Rightly or wrongly, the longstanding principal military commentary on the law of evidence had expressed the view that, if any legitimate purpose besides criminal investigation existed for recording evidence, it would not be within the limitation stated in the Manual.[12] Decisions of the Court of Military Appeals on related matters have not foreshadowed *Porter*.[13] Nor do we regard the result as having been foreshadowed by Chief Judge Fletcher's comment in *United States v. Nault*.[14] His observation was dictum and met with a strong dissent.[15] Accordingly, we regard the threshold of newness as having been crossed in *Porter*, rather than in *Nault*.[16]

---

**10.** *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *Brown v. United States,* 508 F.2d 618, 622–23 (3d Cir. 1974), *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975) (retroactivity of a U.S.C.M.A. decision). For discussion of this threshold test, see *United States v. Bowen,* 500 F.2d 960, 975–76 n. 1 (9th Cir. 1974); *United States ex rel. Caban v. Rowe,* 449 F.Supp. 360, 363 (N.D.Ill.1978); and 13 Amer.Crim.L. Rev. 320 (1975).

**11.** *United States v. Bowser,* 33 C.M.R. 844, 850 (A.F.B.R.1963); *accord, United States v. Miller,* 48 C.M.R. 824, 826 (A.C.M.R.1974) (Clause, J., dissenting).

**12.** Department of the Army Pamphlet 27–172, Military Justice: Evidence (12 January 1961) at 238.

**13.** *See, e. g., United States v. Burge,* 1 M.J. 408 (C.M.A.1976), *aff'g,* 50 C.M.R. 200 (N.C.M.R. 1974); *United States v. Evans,* 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972); *United States v. Chaput,* 7 C.M.R. 164 (A.B.R.1952), *rev'd on other grounds,* 2 U.S.C.M.A. 127, 7 C.M.R. 3 (1953); see also Imwinkelried, *The Identification of Original, Real Evidence,* Military Law Review, Summer 1973, at 173–76; Selby, *Official Records and Business Entries: Their Use as Evidence in Courts-Martial and the Limitations Thereon,* Military Law Review, January 1961, at 63–67, 81–82.

**14.** See Note 9, *supra.* The period between the two decisions, *Nault* and *Porter,* is not unlike that between the decisions discussed in *United States v. Crowley,* 7 M.J. 336 (C.M.A.1979). But see note 15, *infra.*

**15.** 4 M.J. at 320–22 (Cook, J.); *see also United States v. Watkins,* 5 M.J. 612, 613–14 note (A.C.M.R.1978) (urging reconsideration of *Nault* dictum); *United States v. Porter,* 5 M.J. 759, 761–62 (A.C.M.R.1978). Determining what, if any, dicta of the Court of Military Appeals are of decisional import involves an element of risk. *Compare United States v. Dillard,* 4 M.J. 577, 582 n. 6 (A.C.M.R.1977) (Fulton, J., dissenting), *with United States v. Hoesing,* 5 M.J. 355, 357 (C.M.A.1978). There is some indication that the Court does not regard the remark concerning chain of custody forms in *Nault* as dictum. See Annual Report of the U.S. Court of Military Appeals for the Period October 1, 1977–September 30, 1978, at 12.

**16.** The Government argues, with some justification we think, that even if the *Porter* rule of inadmissibility were not otherwise new, its seeming applicability to all chain of custody documents is a significant departure from the past. That is, a per se rule is suggested by the Court's failure to discuss the particular circumstances under which the form was initiated or maintained. *Quaere*: Must a chain of custody

### Limiting Retroactivity: Role of Lower Appellate Courts

Having decided that the nature of the *Porter* decision raises a question as to its retroactivity, we turn now to a question not specifically addressed by the parties: may a lower court limit the retroactivity of a decision of a higher court?

 As a general rule, any change in the law occurring after a relevant event in a case will be given effect while that case is on direct review.[17] An appellate court may limit its own decision changing the law to a prospective effect only.[18] However when the higher court has not limited the scope of its new rule to prospective cases only, it has been said that inferior courts must assume that the new rule applies in all situations.[19] Yet, no such view has been adopted by the Court of Military Appeals, which twice has limited the retroactivity of decisions of the Supreme Court.[20] Nor have the Courts of Military Review hesitated in recent years to consider the extent to which a decision of the Court of Military Appeals should be applied retrospectively. In some instances, the conclusion has been that the new rule must be applied to cases such as this one, still undergoing direct review.[21] In other cases, however, Courts of Military Review have held that the new rule should be applied prospectively only.[22] Based on

---

document pertaining to what was thought initially to be lost or abandoned property necessarily be regarded as having been made principally with a view to prosecution?

17. *Hamling v. United States,* 418 U.S. 87, 102, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *United States v. Ortiz,* 16 U.S.C.M.A. 127, 128, 36 C.M.R. 283, 284 (1966); *United States v. Bennett,* 3 M.J. 903, 908 (A.C.M.R.1977).

18. Cases in which the Supreme Court has limited a decision to prospective effect include *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1197 (1967), in which the criteria for resolving retroactivity questions were stated succinctly as follows: (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. *Id.* at 297, 87 S.Ct. 1967.

Using the same criteria, the Court of Military Appeals has limited the retroactivity of certain of its own decisions. *United States v. Mixson,* 5 M.J. 236 (C.M.A.1978); *United States v. Cannon,* 5 M.J. 198 (C.M.A.1978); *United States v. Huson,* 4 M.J. 240 (C.M.A.1978) (mem.); *United States v. Jackson,* 3 M.J. 101 (C.M.A.1977); *cf. United States v. Crowley,* 7 M.J. 336 (C.M.A.1979).

19. *United States v. Fitzgerald,* 545 F.2d 578, 582 (7th Cir. 1976); see *United States v. Gutierrez,* 42 C.M.R. 521, 524 (A.C.M.R.1970); *cf. United States v. Ortiz, supra.* We note that these are expressions of lower courts, rather than of the high courts themselves, and we subscribe instead to the contrary view expressed in Judge Lay's well-reasoned opinion in *Martin v. Wyrick,* 568 F.2d 583 (8th Cir. 1978).

20. *United States v. Bunch,* 19 U.S.C.M.A. 309, 41 C.M.R. 309 (1970) (limiting retroactivity of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), concerning scope of search incident to arrest); *Mercer v. Dillon,* 19 U.S.C.M.A. 264, 41 C.M.R. 264 (1970) (limiting retroactivity of *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), restrictions on exercise of military jurisdiction).

21. *United States v. Woods,* 7 M.J. 750 (A.C.M.R.1979), *certified for review,* 7 M.J. 158 (C.M.A. 1979) (on other grounds); *United States v. Bennett,* 3 M.J. 903 (A.C.M.R.1977); *United States v. Schwade,* 1 M.J. 887 (A.F.C.M.R.1976). Significantly, these cases have reached their conclusions by applying the *Stovall* criteria (note 18, *supra* ) instead of a rule limiting the authority of intermediate appellate courts. *United States v. Martin,* 4 M.J. 852 (A.C.M.R.1978), reaches a similar result, but may be a case involving the issue whether particular conduct was punishable at all, which raises a possibility of full retroactivity. *See United States v. United States Coin and Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971); *cf. Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973).

22. *United States v. Shearer,* 6 M.J. 737 (A.C.M.R.1978); *United States v. Harrell,* 5 M.J. 604 (N.C.M.R.1978); *United States v. Beckman,* 4 M.J. 814 (A.C.M.R.1978); *see also United States v. DeOliveira,* 5 M.J. 623 (A.C.M.R. 1978); *United States v. Washington,* 5 M.J. 615 (A.C.M.R.1978). In some cases, the Court of Military Appeals decision has been given full retroactive effect. *Brooks v. United States,* 2 M.J. 1257 (A.C.M.R.1976); *accord, United States v. Montcalm,* 2 M.J. 787, 793–94 (A.C.M.R.1976) (Cook, J., concurring).

In *United States v. King,* 40 C.M.R. 1030 (A.F.B.R.1969), a Board of Review held that a

those recent precedents, we conclude that we properly may address the question whether *Porter* should be limited to prospective effect.[23]

### Retroactivity v. Prospectivity

■ Turning now to the three-pronged *Stovall* criteria (note 18, *supra* ), we conclude that the holding in *Porter*, excluding chain of custody forms from evidence because made principally with a view to prosecution within the meaning of paragraph 144*d* of the Manual, should not be applied to cases tried before that decision. The widespread and justified reliance on the admissibility of those forms, coupled with the potential for adverse impact on the administration of military justice, outweighs any improvement in the truth-finding function that could be expected.

A. *Purpose of the new rule.* Because it limits an exception to the hearsay rule, the presumed purpose of the rule pertains to the trustworthiness of evidence.[24] It therefore bears on the reliability of the fact-finding process, but that is a matter of degree, and we do not believe that the accuracy of findings of guilty in past trials is open to serious question.[25] Accordingly, full retroactivity is not mandated, and neither do we find any persuasive reason for applying the rule to cases tried before the *Porter* decision was announced. *Cf. Johnson v. New Jersey,* 384 U.S. 719, 728–33, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

B. *Reliance on the former rule.* For reasons we have explained, the *Porter* decision represents a distinct break with the past and, although questioned, was not foreshadowed by the dictum in *Nault.*[26] Even without tracing the history of the regulatory authority therefor, we know that Air Policemen have used these custody receipts at least since 1963.[27] Military Policemen have used them since 1970 or earli-

Supreme Court decision (*O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969)) should apply prospectively only, although that view was later modified in *United States v. Peterson,* 41 C.M.R. 900 (A.F.C.M.R. 1969).

23. My own concern for early resolution of retroactivity questions already has been expressed. *United States v. Arvie,* 7 M.J. 768, 772–73 n. 12 (A.C.M.R.1979). No doubt there are cogent reasons why in a particular case the retroactivity question might not be resolved concurrently with the change in a former rule. In the military setting, however, there are factors that deserve special consideration. One is the likelihood that many similar cases already will be in various stages of trial or appeal when the new rule is announced. The nature of the Uniform Code and military society are such that trials for certain violations occur with marked regularity, and the closeness of the military bar is such that a position taken by one attorney is unlikely to be overlooked by others. A second factor is the relative ease with which the number of similar cases involved can be determined by counsel. A third factor is the increased need to avoid delay in deciding cases. Delays that are tolerated in a civilian setting, even if only grudgingly, are absolutely intolerable in an armed force. Not only is there greater potential for injustice to the individual or to the military organization of which he is a part, or both, but any general deterrent effect of detection and punishment is reduced to the status of a vague rumbling on

the horizon. (The expression is from the story—perhaps apocryphal—that in the Anzio invasion General Mark Clark informed naval gunfire support elements that he wanted them close to the beach with the troops and would not be satisfied with "vague boom-booms on the horizon." Deterrence, like fire support, has a greater motivational effect when it is visible.)

24. See *United States v. Pulley,* 32 C.M.R. 533, 535 (A.B.R.1962); *cf.* Redden and Saltzburg, *Federal Rules of Evidence Manual* 303 (1975) (criminal trial exclusion in Rule 803(8)(B)).

25. See *Johnson v. New Jersey,* 384 U.S. 719, 728–29, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). In this connection, we note that the presumption of regular handling of evidence by those charged with its custody always has been open to rebuttal. Also, *Gosa v. Mayden,* 413 U.S. 665, 679–82, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973), suggests in a more general way that, if military trials were inherently unfair, full retroactivity of *O'Callahan* would have been the result.

26. See notes 14, 15, *supra;* also see The Advocate: A Journal for Military Defense Counsel, March-April 1977, at 4 n. 1.

27. *United States v. Bowser, supra;* see *United States v. Strangstalien,* 7 M.J. 225, 232 n. 5 (C.M.A.1979).

er.[28] Not only has the reliance of trial counsel on this documentary evidence been justified in terms of existing authority, we properly may assume that, because the forms have been routinely made out, they frequently have been used in evidence. The reliance factor, therefore, favors prospectivity.

C. *Effect on the Administration of Justice.* We recognize that we are neither faced with a question of full retroactivity as to convictions already final nor, so far as we are aware, were any cases held in abeyance awaiting the *Porter* decision. *Cf. United States v. Jackson,* 3 M.J. 101, 103 (C.M.A.1977). Nevertheless, applying *Porter* to cases still undergoing direct review would have an unwarranted impact on the administration of military justice. The grave implications of drug abuse in the armed forces heretofore have been recognized: *United States v. Hessler,* 7 M.J. 9, 10 (C.M.A.1979). The magnitude of the problem in terms of criminal cases may be seen from the fact that, in volumes 6 and 7 (to date) of *West's Military Justice Reporter,* 40 percent of the reported full decisions of the Court of Military Appeals involved convictions for drug abuse (in another 13 percent of decisions, the offense was not identified in the opinion). The fungible nature of most drugs suggests that, in whatever number of cases the prosecution may have relied on a custody receipt, drug cases will preponderate. If, for example, that were to be only 10 percent of the Army cases pending on direct review at any one time, some 130 to 150 cases are implicated. Of more importance than numbers are the administrative problems stemming from the comparative mobility of military witnesses (moving, as they do, out of the service as well as within it). This suggests the probable impracticality of many of the rehearings that might otherwise be ordered. As with the other *Stovall* factors, these considerations also favor prospectivity.

Accordingly, we hold that the decision in *Porter* should not be applied to trials con-

cluded before the decision was announced, 7 May 1979.[29] The appellant's trial was concluded in September 1978. We hold that the chain of custody receipt was properly admitted in evidence.

Having concluded, *infra,* that the evidence was lawfully seized, and that, with the aid of the custody receipt, the chain of its custody in an unaltered state was sufficiently proved, we may affirm the conviction.

The findings of guilty and the sentence are affirmed.

Judge DRIBBEN and Judge WATKINS concur.

---

**28.** *United States v. Miller, supra,* 48 C.M.R. at 826.

**29.** We would apply the decision only to trials begun on and after 8 May 1979.